## NATIONAL BOARD OF MARINE UNDERWRITERS v. BOWRING & CO. et al.

(District Court, S. D. New York. November 5, 1906.)

SHIPPING—LOSS OF CARGO—SINKING OF LIGHTER AT PIER.

Evidence considered, in an action against the owner of a lighter to recover for loss of her cargo through her sinking at a pier during the night, and *held* not to show that her sinking was due to unseaworthiness, but that it was caused by a blow received from some unknown vessel in collision with her, or from swells causing her to collide with a vessel or wharf alongside.

In Admiralty.

Black & Kneeland, for libellant.
Convers & Kirlin, for Bowring & Co.
James J. Macklin, for Johnson and Henjes.

ADAMS, District Judge. This action was brought by the National Board of Marine Underwriters against Bowring & Company and Johnson and Henjes, the charterer and owner of the lighter Boaz to recover the value of 428 casks of dried fish lost or destroyed by the sinking of the said lighter in the night of October 19th or in the early morning following, between piers B. and C. Erie Basin, Brooklyn. The libellant was the assignee of several firms in Halifax, Nova Scotia, who in the month of October, shipped the said fish on the Red Cross Line steamer Rosalind bound to New York. The fish were destined for places in Porto Rico. The fish were shipped in good order on the Rosalind and when she reached New York, they were delivered to the respondent Johnson to be carried to the Porto Rico Line of steamers. Johnson was a lighterman and at the time had the Boaz, belonging to Henjes, under charter. After some delay the fish were raised and placed upon a wharf but they were found to be in such a bad condition that they were condemned by the Board of Health as putrid and dangerous to the public health and destroyed under section 1210 of the New York Charter. Laws 1901, p. 515, c. 466. The loss to the shippers was said to be $12,175.

The libellant seeks to recover because it alleges that the lighter was in a defective, unfit and unseaworthy condition. Such condition is denied by the respondents. The unseaworthiness is sought to be established by the alleged fact that the vessel sank near her wharf without apparent cause.

The testimony shows that the fish were duly delivered in New York by the Rosalind and loaded on the deck of the lighter at the pier in Erie Basin. They were consigned to Bowring & Company, who arranged for their transfer by lighter to the connecting line. The dis-

charge from the Rosalind and the loading on the Boaz were completed on the 19th of October, and the lighter then remained in the slip of pier B, where she was loaded, in charge of her mate, a competent sailor, named Albert, about 38 or 40 years of age.  This action was brought January 11, 1906, and the service of the papers was the first notice received by the respondent Johnson, Albert's employer, of any claim to be made upon him.  In the meantime Albert disappeared.  It is shown that he went to sea about the middle of November and could not therefore be produced on the trial.  His statements to several persons, however, were drawn out in cross examination by Bowring & Company which were not objected to by the libellant and were received in evidence.  From them it may be gathered that the lighter was in good condition, not leaking, when the fish were loaded a little before 6 o'clock p. m.  After that the fish were covered with tarpaulins, which took over an hour, and the mate then went below and all through the boat with the captain, who then left her.  The mate at the time went down in the cabin and arranged to sit there and take care of the boat.  He said that about 12 o'clock, the boat received several hard knocks from a swell she was subjected to and he looked outside to ascertain what caused the swell but could not do so; that he then went below again and heard some water running in the hold, which he went to look after and saw the water running in; that he then started to pump and pumped in the rain for a couple of hours but finding he did not gain on the leak, went to a tug boat that was in the basin for assistance but was refused and he tried otherwise without success to obtain help and then went to pumping again but notwithstanding his efforts, the boat sank about 3 or 4 o'clock in the morning.  The master of the lighter was examined in court and corroborated the statement of the mate so far as his knowledge went, and the statements with respect to the swells were corroborated by the watchman on the wharf, who said that the mate told him that he had been pumping all night.  In the latter respect the testimony is inconsistent as far as the statements go and the watchman's version, in this respect, should I think be disregarded because his account would indicate a sinking without a peril.  The testimony taken altogether seems to show that the account given by the mate to the owner and to the master that the pumping commenced at midnight after the hard knocks should be credited.

When the master left at 7 o'clock, the Boaz was lying outside of the lighter Harvester, which hauled in between the Boaz and the pier about 6 o'clock, after the Boaz had finished loading.  The Boaz was lying starboard side to the pier, head out, when the Harvester came and when the latter was put in between the Boaz and the pier, both were lying in the same direction.

It is evident that some accident happened to the lighter during the night, because apart from the mate's account, it appeared that she, though about 40 years old, had been renewed, repaired from time to time and kept in good order.  She was bought by Henjes about 6 years prior to the accident from the Pennsylvania Railroad, when he put new timbers, spars, railing and plank in her, recaulked her and altogether put her in good condition at an expense of about $2,100.  The testi-

mony shows she was in a reasonably sound and strong condition. There is no suggestion of weakness or rottenness about the hull, frames or planking or that the caulking was defective in any particular. She had been regularly employed, carrying cargoes to the satisfaction of people using her. On the day before the accident she had carried 130 tons without developing any leaks, while this load was only 96 or 97 tons. She was insured to carry 100 tons and cargoes on her were regularly covered by policies.

There seems to be no doubt that the lighter by reason of swells from some passing steamers pounded heavily several times against the Harvester or the pier. On a survey held on the 26th of October, it was found that a 3x10 plank at the light water line on the starboard side about amidships was broken between 2 frames. The wood surrounding the break was found to be sound. A surveyor, who was in court as a witness for the libellant but was not put upon the stand until the close of the case when, some comment having been made upon the circumstance, the libellant examined him. He said that the broken plank was sufficient to account for the sinking. I have no doubt that such is the fact and I think that no presumption of unseaworthiness arises from the evidence in the case.

Libel dismissed.